**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IDA MAE WHITLEY, | ) | FILED: MAY 30, 2008 |
| | ) | 08CV3114   RCC |
| Plaintiff, | ) | JUDGE CASTILLO |
| | ) | MAGISTRATE JUDGE VALDEZ |
| v. | ) | |
| | ) | |
| TAYLOR, BEAN & WHITAKER MORTAGE | ) | |
| CORP.; ADVANCE LENDING GROUP, CORP. | ) | |
| GIL & GIL GROUP CORP. REAL | ) | |
| ESTATE-LINCOLN; FAVIAN CARDENAS; | ) | |
| BLUE HORIZON REAL ESTATE CORP.; | ) | |
| and DOES 1-10, | ) | **JURY DEMANDED** |
| | **)** | |
| Defendants. | ) | |

## COMPLAINT

### INTRODUCTION

1.      Plaintiff Ida Mae Whitley brings this action against a sub-prime mortgage lender, a mortgage broker, a real estate agent and others to secure redress for fraud other predatory lending practices.

### JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction under 28 U.S.C. §§1331 (general federal question), 1337 (interstate commerce), 15 U.S.C. § 1679b (Credit Repair Organizations Act) and 1367 (supplementary jurisdiction).

3.      Defendants all transact business in the District and are deemed to reside here.

### PARTIES

4.      Plaintiff Ida Mae Whitley is a first-time home owner who, with her husband, resides in a single-story, raised ranch house located at 8519 S. Kenton Avenue, Chicago, IL 60652.

5.      Plaintiff is African-American.

6.      Defendant Taylor, Bean & Whitaker Mortgage Corp. ("TB&W") is a residential mortgage lender with corporate headquarters in Ocala, Florida.  TB&W is primarily a wholesale lender in that most of its mortgage loans are arranged or brokered by authorized mortgage brokers and small banks.  TB&W also maintains a number of retail branch offices throughout the United States, including one in Oakbrook Terrace, Illinois.  TB&W registered agent in Illinois is Frances M. Kristina, Taylor, Bean & Whitaker Mortgage Corp., 1 South 443 Summit Avenue, Suite #204, Oakbrook Terrace, Illinois, 60181.

7.      Defendant Advance Lending Group, Corp. [sic] ("Advance Lending") is an Illinois mortgage broker with offices at 1830 West Foster Avenue, Chicago, Illinois, 60640 and/or 4457 West Fullerton Avenue, Chicago, Illinois, 60639.  Advance Lending's president and secretary is or was Oswaldo Ochoa (a.k.a. "Ozzie"), who, on information and belief, may be found at 6345 S. Keeler, Chicago, Illinois, 60629.  Advance Lending's registered agent is O. Allen Fridman, 555 Skokie Boulevard, Suite #500, Northbrook, Illinois, 60062.

8.      Defendant Favian Cardenas is an Illinois licensed real estate broker.  On information and belief, at the time of plaintiff's transaction he was employed by Gil & Gil Group Corp. Real Estate-Lincoln ("Gil & Gil"), a residential real estate brokerage corporation located at 4306 N. Lincoln Avenue, Chicago, 60618.  Also at that time, Cardenas had his own corporation, defendant Blue Horizon Real Estate Corp. ("Blue Horizon"), also a residential real estate brokerage corporation, which, on information and belief, is currently located at 3526 North

2

Lincoln Avenue, Chicago, Illinois, 60657.  On information and belief, Cardenas currently resides at 1024 Austin, Evanston, Illinois, 60602.

9.      DOES 1-10 are any other persons who engaged in or aided and abetted the predatory practices alleged below and whose identities and whereabouts are as yet unknown to plaintiff.

## FACTS RELATING TO ALL CLAIMS

10.      Plaintiff and her husband are simple, unsophisticated consumers. Plaintiff's credit was excellent at the time she obtained the loans from defendants.

11.      In late 2005, after renting apartments for all of their adult lives - primarily in the dangerous, North Lawndale neighborhood in Chicago - plaintiff and her husband, then ages 56 and 60, respectively, decided to purchase a home in order to have a safe and stable place to live during their retirement.

12.      In January, 2006, plaintiff found Gil & Gil, Cardenas and Blue Horizon through their adult daughter, Kenna Whitley, who was trying to assist her parents.  Plaintiff and her family explained to Cardenas that they knew nothing about the process of buying a home and that they were looking to him for help.  Kenna asked Cardenas to "do for them what you would do for your own parents."  Plaintiff and her family placed their trust in Cardenas.

13.      In early April, 2006, when plaintiff and her family liked the home they saw at 8519 S. Kenton, Cardenas did not advise or instruct them on how to make an offer or on how to negotiate the purchase price or other terms of the real estate purchase contract.

14.      After plaintiff's offer for the asking price was accepted, on information and belief Cardenas arranged every aspect of plaintiff's real estate and loan transactions,

including but not limited to:  the home inspection, the appraisal, plaintiff's closing attorney, plaintiff's home owner's insurance policy, and the financing.

15.     Plaintiff and her family never saw or spoke to anyone but Cardenas concerning the financing for the purchase or the terms of financing.  They never spoke to or met with Anita Logan, whose name appears on the loan application for the second-lien loan (Exhibit H) as the interviewer employed by Advance Lending.  Because plaintiff and her family had never been through the home financing process before, this did not seem odd to them.  Cardenas then told plaintiff where and when closing would take place, and plaintiff showed up, as instructed.

16.     At all times, Gil & Gil, Cardenas and/or Blue Horizon was/were the agent(s) of TB&W and of Advanced Lending for purposes of all representations made to plaintiff concerning the loan terms.  They had actual and/or apparent authority from TB&W and Advanced Lending.

17.     Cardenas was also an agent of Gil and Gil and of Blue Horizon.

18.     Cardenas promised plaintiffs that their payment would be no more than $1,800 per month, including principal, interest, and monthly escrow amounts for taxes and insurance.  Based on Cardenas' representation, plaintiff believed her family could afford the monthly payments.  At that time, the family's monthly rental payment was $925.00.

19.     Plaintiff never received any written, preliminary disclosures of loan terms, such as a Good Faith Estimate of Settlement Charges or a preliminary Truth In Lending Disclosure Statement.

20.     In addition, Cardenas told plaintiff that, after six months, she could refinance with him in order to obtain a lower interest rate and lower monthly payment.

4

21.     To bait plaintiff still further, Cardenas also told her that, after settlement, she would receive an $8,000.00 rebate.

22.     Closing occurred on or about May 30, 2006.  Cardenas was not present, having claimed to be out of town.

23.     Plaintiff was asked to sign documents twice.  She signed one set of documents at about 10:30AM.  Another set of documents was not ready for signing until about 3:00PM on the same day.  Both signings were rushed.  Plaintiff did not receive any explanation about the contents of the documents or the terms of financing.

24.     In addition, at closing plaintiffs were not given, to take home with them, copies of all of the documents they signed, including, without limitation, the note for the second-lien loan and the final, 1003 loan application for the first-lien loan.

25.     Unbeknownst to plaintiff, defendants had arranged for an "80/20" loan for 100% of the appraised, market value of the home.  Plaintiff did not discover she had been given two loans until two months later, after she made the first payment in the amount of $2,077.34 to TB&W and, despite making the payment, received a phone call from Citimortgage, Inc., claiming that her payment in the amount of $462.58 (for a second loan) was late.

26.     Plaintiff was never informed that the house payment would be $2,539.92 per month, inclusive of escrow. This information was concealed from her.

27.     Plaintiff never received, prior to closing, any written or oral notification of change in the loan terms, as required by Illinois law when changes occur.

28.     The following are true and accurate reproductions of documents relating to the transaction:

5

       a.      A note in the amount of $235,200.00 at an interest rate of 7.5% (Exhibit A);

       b.      A first mortgage (Exhibit B);

       c.      A Truth In Lending Statement (Exhibit C) disclosing an Amount Financed of $229,587.34 and an APR of 7.7485%;

       d.      A HUD-1 Settlement Statement (Exhibit D);

       e.      A second mortgage referencing a Note for $58,000 (Exhibit E);

       f.      A Truth In Lending Statement disclosing an Amount Financed of $57,683.81 and an APR of 8.9625% (Exhibit F);

       g.      A second HUD-1 Settlement Statement (Exhibit G); and

       h.      A loan application for the smaller loan (Exhibit H).

## FACTS RELATING TO FRAUD IN THE INDUCEMENT

### Loan Applications

29.      In April, 2006, Cardenas asked plaintiff and her husband for, and they provided to Cardenas, truthful and accurate information and documentation concerning their income, employment, education and race.

30.      Specifically, plaintiff and her husband provided Cardenas with three years of their tax returns, including W-2s, copies of plaintiff's check stubs for the previous six months, 12 months' worth of bank statements, and 12 months' worth of rent receipts.

31.      However, on information and belief Cardenas caused both of plaintiff's final, 1003 loan applications to be completed utilizing false financial and other information about plaintiff.  Cardenas, Logan, and Advance Lending fabricated an entire socio-economic profile for plaintiff.

32.     The application for the smaller loan (<u>Exhibit H</u>, the only application of which plaintiff has a copy) makes plaintiff out to be a white, upper-middle-income, highly educated female with a high-skilled job.  It discloses that she is "White" and "Not Hispanic or Latino" (Section X.), has 16 years of education (i.e., a college degree)(Section III), is employed by the City of Chicago as a "Mechanic" (Section IV.) and earns $6,800.00 per month gross in income from employment (Section V.), the equivalent of $81,600 annually.

33.     The only truth in this profile is that plaintiff is female.  In fact, plaintiff and her husband are dark-complexioned African-Americans.  Plaintiff has a 7th grade education from public schools in Tunica, MI, an area notorious for the highest level of poverty among African-Americans in the U.S.

34.     Further, while plaintiff is employed by the City of Chicago, her position is that of a "Garage Attendant," not a "Mechanic."  She is responsible for checking the fluid levels on trucks and no more.

35.     In May, 2006, plaintiff earned $16.50 an hour or about $2,840 gross per month or about $34,000 annually – less than half the amount the loan application says she earned.

36.     Plaintiff and her family were paying $925.00 per month in rent in May, 2006, not $1,100, as the application states (Section V.).

37.     Further, Mr. Whitley receives a Social Security disability benefit as his sole income.

### <u>Appraisal</u>

38.     Prior to April 13, 2006, Cardenas and/or Advance Lending ordered and arranged for an appraisal of the property at 8519 S. Kenton in Chicago.

39.    The appraiser was Daniel Sompolski, an Illinois licensed appraiser and real estate broker.  As a real estate broker, Sompolski was disciplined in 2004.

40.    Sompolski was Cadenas' and/or Advance Lending's agent for purposes of performing the appraisal.

41.    On information and belief, Cardenas and/or Advanced Lending conspired with Sompolski prior to April 13, 2006 to arrange for a fraudulently inflated appraisal of the market value of the property at 8519 South Kenton.

42.    On information and belief, Cardenas, Ozzie or Logan contacted Sompolski prior to April 13, 2006, and advised him of the value they needed (i.e., at least $294,000, which was the contract purchase price) in order to support the loan amounts they needed or wanted to make to plaintiff.  They agreed upon a value in advance of any actual appraisal.

43.    Sompolski obliged in order to continue to receive a stream of business from Advanced Lending.  On information and belief, a large share of the volume of Sompolski's business in 2006 came through Advanced Lending.

44.    On or April 13, 2006, Sompolski appraised the home and property and prepared an appraisal report stating that the market value was $295,000.  This amount was significantly and artificially inflated relative to comparable homes in the area.

45.    On information and belief, Cardenas, Logan, Ozzie and Advanced Lending conspired and arranged to insert false information on plaintiff's loan applications and to inflate the home's appraised value in order to make it appear that she could afford to borrow repay the loans.

46.    The income stated on the loan application and the reported, appraised value supports the loan amounts they wanted or needed to make in order to finance the asking

8

price of the property. They inserted the false information onto the final loan applications and arranged for plaintiffs to sign the applications at closing.

47.     In addition, on information and belief, prior to May 30, 2006, Cardenas, Advanced Lending and/or Logan transmitted the fraudulent information about plaintiff's income, employment and the property value to TB&W's underwriters.

48.     Prior to approving the loan, TB&W performed its own underwriting analysis of plaintiff's qualifications for the loan and approved the loan. TB&W knew or should have known that the income, employment and home appraisal submitted for plaintiff was fraudulent and inflated.

49.     TB&W had a non-delegable duty to verify plaintiff's income and employment information. In fact, on information and belief, TB&W performed a verification of employment and an independent inquiry of the value of the property.

50.     Further, on information and belief, TB&W required and obtained, prior to closing, a photocopy of plaintiff's photo identification from which it was apparent that plaintiff was not "white."

51.     On information and belief, TB&W also had other information from Advanced Lending and/or plaintiffs from which it knew or should have known of fraud.

52.     On information and belief, following closing TB&W performed another analysis, an internal audit, on plaintiff's loan file to check to ensure that the income, and employment and appraised value were accurate and/or had been verified. Once again, TB&W passed the loan when any reasonable inquiry would or should have revealed fraud by TB&W's broker.

53.    In fact, Mrs. Whitley could not afford the payments on the loans.  By basing the loans on an inflated home value, falsely inflated income figures, supported by a false employment and educational information, defendants fraudulently represented to plaintiff that she could afford the home.  Defendants knew all along that she and her husband could not afford to make the payments based on their actual income.

54.    Defendants faced an enticing commission structure.  They falsely inflated plaintiff's income and appraised value in order to induce her into taking out the purchase money loan, which in turn increased the amount of TB&W's, Advanced Lending's and Logan's percentage-based, closings fees and commissions, as well as TB&W's future interest income and profits from the loans.  TB&W also paid handsome yield spread premium payments to Advanced Lending in connection with both loans.

55.    In addition, on information and belief, Cardenas received an illegal kickback payment in exchange for steering plaintiff's financing business to Advanced Lending, Ozzie, Logan and/or TB&W.

56.    On information and belief, Cardenas and other defendants have a pattern and practice of committing the same type misrepresentation and fraud against consumers in other mortgage transactions.

57.    Plaintiff and her family have attempted three times to refinance out of defendants' loans.  However, due to defendants' initial fraud of concealing that they were giving loan amounts based on an inflated property value and borrower income, plaintiff's applications were rejected.

58.    Plaintiff and her family have repeatedly requested loan modifications from TB&W and Citimortgage, Inc., the current servicer of the second-lien loan, but their requests have been denied – for the same reasons.

59.    In January, 2008, TB&W initiated a foreclosure action against plaintiff and her husband in the Circuit Court of Cook County, 08 CH 07849.  Plaintiff and her husband are now faced with the prospect of losing their home at the dawn of their retirement.

## COUNT I – CREDIT REPAIR ORGANIZATIONS ACT

60.    Plaintiff incorporates paragraphs 1-59.    This claim is against all defendants.

61.    Defendants violated the CROA by fraudulently inflating and falsifying plaintiff's income, employment and other pertinent information on their loan applications and by conspiring to fraudulently overstate the value of plaintiff's home.

62.    CROA §1679b provides:

**1679b.  Prohibited practices**

**(a) In general.  No person may--**

**(1) make any statement, or counsel or advise any consumer to make any  statement, which is untrue or misleading (or which, upon the exercise of  reasonable care, should be known by the credit repair organization, officer, employee, agent, or other person to be untrue or misleading) with respect to any consumer's credit worthiness, credit standing, or credit capacity to--  . . .**

**(B) any person--**

**(i) who has extended credit to the consumer; or**

**(ii) to whom the consumer has applied or is applying for an extension  of credit . . . .**

60.    CROA § 1679g provides:

**1679g.  Civil liability**

**(a) Liability established.  Any person who fails to comply with any provision of  this title [15 USC §§1679 et seq.] with respect to any other person shall be liable to such person in an amount equal to the sum of the amounts determined  under each of the following paragraphs:**

    **(1) Actual damages. The greater of--**

        **(A) the amount of any actual damage sustained by such person as a result of such failure . . . .**

    **(2) Punitive damages.**

        **(A) Individual actions. In the case of any action by an individual, such additional amount as the court may allow. . . .**

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against defendants for:  compensatory, punitive and other appropriate damages; equitable relief; attorney's fees, litigation expenses and costs; and such other or further relief as the Court deems appropriate.

## <u>COUNT II - ILLINOIS CONSUMER FRAUD ACT</u>

63.    Plaintiff incorporates paragraphs 1-59.  This claim is against all defendants.

64.    Defendants engaged in unfair and deceptive practices, in violation of §2 of the Illinois Consumer Fraud Act, 815 ILCS 505/2, by engaging in the conduct detailed above, including but not limited to:  misrepresenting the loan terms to plaintiff, falsifying plaintiff's material information on plaintiff's loan application, fraudulently inflating the appraised value of plaintiff's home, approving a loan based on such information, disguising the fact that plaintiff was receiving loans she could not afford, and knowingly engaging in improvident lending with respect to plaintiff.

65.     Defendants engaged in such conduct in the course of trade and commerce.

66.     Defendants engaged in such conduct with the intent that plaintiff rely on their deception.

67.     Defendants engaged in such conduct with the intent to injure plaintiff.

68.     Plaintiff was damaged as a result.

69.     Defendants' conduct caused plaintiff's injuries.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against defendants for: compensatory, punitive and other appropriate damages; equitable relief; attorney's fees, litigation expenses and costs; and such other or further relief as the Court deems appropriate.

## COUNT III - BREACH OF FIDUCIARY DUTY

70.     Plaintiff incorporates paragraphs 1-59. This claim is against Cardenas, Gil & Gil, Blue Horizon and Advanced Lending.

71.     One who undertakes to find and arrange financing for another becomes the latter's agent for that purpose and owes a fiduciary duty to act in the interest of the principal and make full disclosure of all material facts.

72.     Further, a real estate agent has a fiduciary duty to his principal.

73.     Cardenas, Gil & Gil, Blue Horizon and Advanced Lending undertook to serve as plaintiff's mortgage broker.

74.     Cardenas, Gil & Gil, and Blue Horizon also undertook to serve as plaintiff's real estate agent.

75.     Defendants breached their respective fiduciary duties to plaintiff by engaging in conduct that was fraudulent and directly adverse to the interests of plaintiff.

13

76.    Defendants disregarded the interests of plaintiff and acted purely for their own financial benefit.

77.    Plaintiff was injured and damaged as a result.

78.    Defendants' conduct was deliberately oppressive, corrupt and dishonest. Substantial punitive damages are warranted.

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiff and against defendants for:  compensatory, punitive and other appropriate damages; equitable relief; costs; and such other or further relief as the Court deems appropriate.


Respectfully submitted,


s/Al Hofeld, Jr.
Al Hofeld, Jr.

Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
and The Social Justice Project,
208 S. LaSalle Street, Suite #1650
Chicago, Illinois  60604
Phone - (312) 345-1004
Fax - (312) 346-3242
al@alhofeldlaw.com

JURY DEMAND

Plaintiff demands trial by jury.


s/Al Hofeld, Jr.
Al Hofeld, Jr.

<u>NOTICE OF LIEN</u>

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards.


<u>s/Al Hofeld, Jr.</u>
Al Hofeld, Jr.


Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
and The Project for Social Justice, Inc.
208 S. LaSalle Street, Suite #1650
Chicago, Illinois 60604
Phone - (312) 345-1004
Fax – (312) 346-3242
<u>al@alhofeldlaw.com</u>

08CV3114  RCG
JUDGE CASTILLO
MAGISTRATE JUDGE VALDEZ

# EXHIBIT A

# NOTE

| | | |
|---|---|---|
| **May 30, 2006** | **Chicago** | **Illinois** |
| [Date] | [City] | [State] |

**8519 S. KENTON AVE**
**Chicago, IL  60652**
[Property Address]

### 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ **235,200.00**                (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Taylor, Bean & Whitaker Mortgage Corp.**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of        **7.5000%**.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

### 3.  PAYMENTS

**(A)  Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the        **1st**        day of each month beginning on        **July 01, 2006**        . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **June 01, 2036**                , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **Taylor, Bean & Whitaker Mortgage Corp., 1417 North Magnolia Ave, Ocala, FL  34475**

or at a different place if required by the Note Holder.

**(B)  Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $**1,644.55**

### 4.  BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

---

MULTISTATE FIXED RATE NOTE—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT             **Form 3200 1/01**
GREATLAND ■
ITEM T1646L1 (0011)                    *(Page 1 of 3 pages)*             To Order Call: 1-800-530-9393 □ Fax 616-791-1131



*230301136397*

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of **Fifteen** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.0000%** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in

this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Borrower has executed and acknowledges receipt of pages 1 through 3 of this Note.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

_____ (Seal)          _____ (Seal)
**IDA WHITLEY**                          -Borrower                                     -Borrower


_____ (Seal)          _____ (Seal)
                                         -Borrower                                     -Borrower


_____ (Seal)          _____ (Seal)
                                         -Borrower                                     -Borrower


*[Sign Original Only]*

# EXHIBIT B

Name:

Address:

**Taylor, Bean & Whitaker Mortgage Corp.**
**1417 North Magnolia Ave**
**Ocala, FL 34475**

After Recording Return To:
TICOR TITLE
6250 W. 95 STREET
OAK LAWN                    , IL
60803

_____ [Space Above This Line For Recording Data] _____

# MORTGAGE

MIN: 1000295000113639 TICOR TITLE
                        587151

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A)   "Security Instrument" means this document, which is dated **May 30, 2006**                    , together with all Riders to this document.

(B)   "Borrower" is  **CLYDE WHITLEY AND IDA WHITLEY**


Borrower is the mortgagor under this Security Instrument.

(C)   "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D)   "Lender" is  **Taylor, Bean & Whitaker Mortgage Corp.**
Lender is a  **a Florida Corporation**                                        organized and existing under
the laws of  **FL**                                                . Lender's address is
**1417 North Magnolia Ave, Ocala, FL  34475**


(E)   "Note" means the promissory note signed by Borrower and dated  **May 30, 2006**                    . The Note states that Borrower owes Lender  **Two Hundred Thirty Five Thousand Two Hundred and no/100**
                    Dollars (U.S. $ **235,200.00**                ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than  **June 01, 2036**

(F)   "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                    Form 3014 1/01
ITEM T9608L1 (0011)—MERS                    (Page 1 of 12 pages)                    GREATLAND ■
                                        To Order Call: 1-800-530-9393 □ Fax: 616-791-1131



*0240691136397*

**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider ☐ Condominium Rider ☐ Second Home Rider

☐ Balloon Rider ☐ Planned Unit Development Rider ☐ Other(s) [specify]

☐ 1-4 Family Rider ☐ Biweekly Payment Rider

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(L) "Escrow Items"** means those items that are described in Section 3.

**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS the following described property located in the

| County | of | Cook | : |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

**See Attached Exhibit A.**

which currently has the address of                    **8519 S. KENTON AVE**
                                                            [Street]

**Chicago**        , Illinois        **60652**        ("Property Address"):
[City]                                 [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.    **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or

partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

    **2.**    **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

    If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

    Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

    **3.**    **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

    Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

    The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4.    **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5.    **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly.

Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6.    Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7.    Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8.    Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9.    Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) **Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) **Any such agreements will not affect the rights Borrower has—if any—with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12.  Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13.  Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14.  Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan

charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon

ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

ITEM T9608L9 (0011)—MERS

*(Page 9 of 12 pages)*

Form 3014 1/01

GREATLAND ■

To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not

cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waiver of Homestead.** In accordance with Illinois law, the Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

25. **Placement of Collateral Protection Insurance.** Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's collateral. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

**ILLINOIS**—Single Family—**Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**

ITEM T9608L11 (0011)—MERS

*(Page 11 of 12 pages)*

**Form 3014 1/01**
GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax 616-791-1131

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 through 12 of this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)          _____ (Seal)
IDA WHITLEY                     -Borrower                                         -Borrower


_____ (Seal)          _____ (Seal)
                                -Borrower                                         -Borrower


_____ (Seal)          _____ (Seal)
                                -Borrower                                         -Borrower


Witness:                                         Witness:

_____                  _____


State of Illinois
County of

    This instrument was acknowledged before me on                                  (date) by


                                                 (name[s] of person[s]).


                                                 _____
                                                                    Notary Public


ILLINOIS—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                  Form 3014 1/01
                                                                                  GREATLAND ■
ITEM T9608L12 (0011)—MERS              (Page 12 of 12 pages)      To Order Call: 1-800-530-9393 □ Fax: 616-791-1131

# EXHIBIT C

# TRUTH-IN-LENDING DISCLOSURE FOR REAL ESTATE MORTGAGE LOANS

NAME(S)/ADDRESS(ES) OF BORROWER(S) ("Borrower", "you" or "your")

IDA WHITLEY
4527 W. LEXINGTON
Chicago, IL 60644

LENDER/BROKER ("Lender", "Creditor", "we", "us" or "our")

Taylor, Bean & Whitaker Mortgage Corp.
1417 North Magnolia Ave
Ocala, FL 34475

PROPERTY ADDRESS 8519 S. KENTON AVE, Chicago, IL 60652 Cook

LOAN NUMBER 1135397    DATE 04/30/2006    Cook

| ANNUAL PERCENTAGE RATE | FINANCE CHARGE | AMOUNT FINANCED | TOTAL OF PAYMENTS |
|---|---|---|---|
| The cost of your credit as a yearly rate. | The dollar amount the credit will cost you. | The amount of credit provided to you or on your behalf. | The amount you will have paid after you have made all payments as scheduled. |
| 7.7493% | $382,464.30 | $226,587.34 | $592,451.64 |
| □ Preliminary ☒ Final | | | |

☒ I am applying only for the ☐ I am applying for ... "X" means estimate ...

The annual percentage rate may increase during the term of this transaction if the ...

The information concerning the variable rate provision of this transaction. The rate may not increase more than the ... and may not increase more than ...

☐ This transaction is subject to a variable rate feature and is secured by your principal dwelling. Variable rate disclosures have been provided to you at an earlier time.
☐ This adjustable/variable rate feature. ☐ The disclosures are based on an assumed maturity of one year.

PAYABLE ON DEMAND:
Filing / Recording Fee $75.00

You may obtain property insurance from anyone acceptable to the lender.

☐ Goods being purchased.
☒ Other (Describe) 8519 S. KENTON AVE, Chicago, IL 60652 Cook
    ☐ an amount equal to    or ☒    6.00 % of the payment in default.

If you pay off early, you
☐ may ☒ will not    have to pay a penalty.
☐ may ☒ will not    be entitled to a refund of part of the finance charge.

Please refer to the Adjustable Rate Mortgage Document for specific ...

If this loan is to purchase and is secured by your ... dwelling cannot assume the remainder of this purchase money mortgage loan on the original terms.
☐ someone buying your
☒ someone buying your dwelling cannot assume the remainder of this purchase money mortgage loan.

☒ Please refer to the itemization of Amount Financed Statement.

By signing you acknowledge receipt of a completed copy of this disclosure. You understand that this is not a contract and does not reflect all of the terms and conditions of the mortgage transaction to which the disclosures reflected on this form relate.

X _____    DATE _____
IDA WHITLEY

X _____    DATE _____

X _____    DATE _____

© GHR/FLANG 1996 ITEM 9701MLG (0404)    GHR/FLANG III 3-Order Call 1-800-555-5555 □ Fax 510-781-1511

X   FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT - PART II "ITEMIZATION OF AMOUNT FINANCED"

GOOD FAITH ESTIMATE OF SETTLEMENT CHARGES

Listed below is the Good Faith Estimate of Settlement Charges made pursuant to the requirements of the Real Estate Settlement Procedures Act (RESPA). These figures are only estimates and the actual charges due at settlement may be different. This is not a commitment to make a loan.

CREDITOR:
Taylor, Bean & Whitaker Mortgage Corp.
1417 North Magnolia Ave
Ocala, FL 34475

RE:
IDA WHITLEY
4827 W. LEXINGTON
Chicago, IL 60644

DATE: 05/20/2006

LOAN NUMBER: 1138397

## ITEMIZATION OF AMOUNT FINANCED

AMOUNTS PAID TO OTHERS ON YOUR BEHALF:
Loan proceeds to:
Recording/Filing Fees
Credit Report Fees to:                                                  75.00
Appraisal Fees to:          Advance Lending Group C                     250.00
Title Insurance:                                                        198.50

|  | AMOUNT FINANCED $ | 228,587.34 |
|  | PREPAID FINANCE CHARGE $ | 6,412.66 |

| Itemization of Prepaid Finance Charge: | | LOAN AMOUNT: $ | 235,000.00 |
| Loan Origination Fee | 3,528.00 | | |
| Discount Points | 84.66 | | |
| Prepaid Interest ( 2 days) | | | |
| Initial PMI Premium | 190.00 | | |
| Attorney Fee | 73.00 | | |
| Tax Service Fee | 616.00 | | |
| Administration Fee | 825.00 | | |
| Settlement/Closing Fee | 785.00 | | |
| Processing Fee | | | |

This form does not cover all items you will be required to pay in cash at settlement; deposits in escrow for real estate taxes and insurance may be different. You may wish to inquire as to the amounts of such other items. You may be required to pay additional amounts at settlement.

TOTAL PREPAID FINANCE CHARGE  $   6,412.66

Neither you nor the lender previously has become obligated to make or accept this loan, nor is any such obligation made by the delivery or signing of this disclosure. The Undersigned acknowledge receiving and reading a completed copy of this disclosure.

_____        _____
Applicant                        Date

_____        _____
Applicant                        Date

_____        _____
Applicant                        Date

# EXHIBIT D

**A.**

**TICOR TITLE INSURANCE COMPANY**

CLOSER: Janet L. Fettig

DATE OF PRINTING: 05/30/06
TIME OF PRINTING: 11:51

**SETTLEMENT STATEMENT**
**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

| **B. TYPE OF LOAN** | | |
|---|---|---|
| 1. ☐ FHA | 2. ☐ FmHA | 3. ☐ CONV. UNINS. |
| 4. ☐ VA | 5. ☒ CONV. INS. | |
| 6. File Number: | 587151 | JLF |
| | 000587151-001 JLF | OC |
| 7. Loan Number | 1136397 | |
| 8. Mortgage Insurance Case Number | | |

OMB No. 2502-0265

**C. NOTE:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| | |
|---|---|
| **D. NAME OF BORROWER:** | IDA WHITLEY, SEE ATTACHED |
| **ADDRESS:** | 4927 W LEXINGTON |
| | CHICAGO          ILLINOIS          60644 |
| **E. NAME OF SELLER:** | MARGARET WILK |
| **ADDRESS:** | 8519 S. KENTON |
| | CHCIAGO          ILLINOIS          60644 |
| **F. NAME OF LENDER:** | TAYLOR BEAN & WHITAKER MORTGAGE CORP |
| **ADDRESS:** | 1417 N. MAGNOLIA AVENUE |
| | OCALA          FLORIDA          34475-9078 |
| **G. PROPERTY LOCATION:** | 8519 S. KENTON |
| | CHICAGO          ILLINOIS          60652 |
| **H. SETTLEMENT AGENT:** | TICOR TITLE INSURANCE COMPANY |
| **ADDRESS:** | 6250 WEST 95th STREET |
| | OAK LAWN          ILLINOIS          60453 |
| **PLACE OF SETTLEMENT:** | 6250 WEST 95th STREET |
| **ADDRESS:** | OAK LAWN          ILLINOIS          60453 |
| **I. SETTLEMENT DATE:** | May 30, 2006    10:30 |
| **DISBURSEMENT DATE:** | May 30, 2006 |

| **J. SUMMARY OF BORROWER'S TRANSACTION** | | **K. SUMMARY OF SELLER'S TRANSACTION** | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER:** | | **400. GROSS AMOUNT DUE TO SELLER:** | |
| 101. Contract sales price | 294,000.00 | 401. Contract sales price | 294,000.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to borrower (line 1400) | 9,127.82 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| **Adjustments for items paid by seller in advance** | | **Adjustments for items paid by seller in advance** | |
| 106. City/town taxes            to | | 406. City/town taxes            to | |
| 107. County taxes            to | | 407. County taxes            to | |
| 108. Assessments            to | | 408. Assessments            to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. GROSS AMT DUE FROM BORROWER** | 303,127.82 | **420. GROSS AMT DUE TO SELLER** | 294,000.00 |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201. Deposit or earnest money | 1,000.00 | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 235,200.00 | 502. Settlement charges to seller (line 1400) | 15,459.31 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| | | 504. Payoff of first mortgage loan | |
| 204. PROCEEDS FROM 2ND MORTGAGE | 57,219.30 | CITIMORTGAGE | 49,430.50 |
| 205. | | 505. Payoff of second mortgage loan | |
| | | AMERICAN HOME MORTGAGE | 108,519.41 |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. DEPOSIT APPLIED TO BROKER'S COMMISSION | 1,000.00 |
| 209. | | 509. | |
| **Adjustments for items unpaid by seller** | | **Adjustments for items unpaid by seller** | |
| 210. City/town taxes            to | | 510. City/town taxes            to | |
| 211. County taxes   07/01/05 to 12/31/05 | 1,348.55 | 511. County taxes   07/01/05 to 12/31/05 | 1,348.55 |
| 212. Assessments            to | | 512. Assessments            to | |
| 213. COUNTY TAXES 01/01/06 TO 05/30/06 | 1,016.03 | 513. COUNTY TAXES 01/01/06 TO 05/30/06 | 1,016.03 |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. CLOSING COST CREDIT PER CONTRACT | 8,000.00 | 516. CLOSING COST CREDIT PER CONTRACT | 8,000.00 |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER** | 303,783.88 | **520. TOTAL REDUCTIONS AMT DUE SELLER** | 184,773.80 |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER** | | **600. CASH AT SETTLEMENT TO/FROM SELLER** | |
| 301. Gross amt due from borrower (line 120) | 303,127.82 | 601. Gross amt due to seller (line 420) | 294,000.00 |
| 302. Less amts paid by/for borrower (line 220) | ( 303,783.88 ) | 602. Less reductions in amt due seller (line 520) | ( 184,773.80 ) |
| 303. CASH (☐ FROM) (☒ TO) BORROWER | 656.06 | 603. CASH (☒ TO) (☐ FROM) SELLER | 109,226.20 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Borrower _Ida Whitley_          Seller _Margaret Wilk_

IDA WHITLEY                              MARGARET WILK

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

Settlement Agent _J.L. Fettig_          Date  5-30-06

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

HUD-1 (3/86) RESPA, HB 4305.2

F-2857-01 4/80

| ORD#/ABS# | 587151 | JLF |
|---|---|---|
| ESC# | 000587151 | JLF OC |

Page 2

OMB No. 2502-0265

## L. SETTLEMENT CHARGES

TIME OF PRINTING: 11:51
DATE OF PRINTING: 05/30/06

| | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|
| **700.** | **TOTAL SALES/BROKER'S COMMISSION** based on price $ 294,000.00 @ 4.864 % = 14,300.00 | | |
| | Division of Commission (line 700) as follows: | | |
| 701. | LB: 2.466 $ 6,250.00 to REMAX | | |
| 702. | SB: 2.398 $ 7,050.00 to FAVIAN CARDENAS | | |
| 703. | Commission paid at Settlement (Money retained by broker applied to commission $ 1,000.00 ) | | 13,300.00 |
| 704. | Other sales agent charges: | | |
| 705. | Additional commission: $ to | | |
| **800.** | **ITEMS PAYABLE IN CONNECTION WITH LOAN** | | |
| 801. | Loan Origination Fee 1.500 % ADVANCE LENDING GROUP CORP | 3,528.00 | |
| 802. | Loan Discount % | | |
| 803. | Appraisal Fee to ADVANCE LENDING GROUP CORP | 250.00 | |
| 804. | Credit Report to | | |
| 805. | Lender's Inspection Fee to | | |
| 806. | Mortgage Insurance Application Fee to | | |
| 807. | Assumption Fee to | | |
| 808. | PAR PREMIUM TO ADVANCE LENDING GROUP $4958.02 POC BY TBW | | |
| 809. | PROCESSING FEE TO ADVANCE LENDING GROUP | 725.00 | |
| 810. | TAX SERVICE FEE TO TAYLOR BEAN & WHITAKER MORTGAGE CORP | 73.00 | |
| 811. | ADMIN FEE TO TAYLOR BEAN & WHITAKER MORTGAGE CORP | 515.00 | |
| 812. | | | |
| **900.** | **ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | |
| 901. | Interest from 05/30/06 to 06/01/06 @$ 48.3300 /day for 2 days | 96.66 | |
| 902. | Mortgage Insurance Premium for 0.00 months to | | |
| 903. | Hazard Insurance Premium for 0.00 years to | | |
| 904. | | | |
| 905. | | | |
| **1000.** | **RESERVES DEPOSITED WITH LENDER** | | |
| 1001. | Hazard insurance 2.00 month @$ 73.42 per month | 146.84 | |
| 1002. | Mortgage insurance 0.00 month @$ per month | | |
| 1003. | City property taxes 0.00 month @$ per month | | |
| 1004. | County property taxes 4.00 month @$ 187.25 per month | 749.00 | |
| 1005. | Annual assessments 0.00 month @$ per month | | |
| 1006. | 0.00 month @$ per month | | |
| 1007. | 0.00 month @$ per month | | |
| 1008. | Aggregate Accounting Adjustment | ( 293.68) | 0.00 |
| **1100.** | **TITLE CHARGES** | | |
| 1101. | Settlement or Closing Fee to TICOR TITLE INSURANCE COMPANY | 525.00 | |
| 1102. | Abstract or title search to | | |
| 1103. | Title examination to | | |
| 1104. | Title insurance binder to | | |
| 1105. | Document preparation to | | |
| 1106. | Notary fees to | | |
| 1107. | Attorney's fee to SMIGIELSKI & WATORS | | 200.00 |
| 1108. | Title insurance to TICOR TITLE - ARKADIUSZ Z. SMIGIELSKI/ATTY | 475.00 | 1,075.00 |
| | (includes above items numbers:) DD ENV COMP | | |
| 1109. | Lender's coverage $ 235,200.00 $ 475.00 | | |
| 1110. | Owner's coverage $ 294,000.00 $ 1,075.00 | | |
| 1111. | EMAIL PACKAGE FEE TO TICOR TITLE INSURANCE COMPANY | 25.00 | |
| 1112. | OVERNIGHT DELIVERY & HADNLING FEE TO TICOR TITLE | | 50.00 |
| 1113. | WATER CERTIFICATION FEE TO TICOR TITLE | | 65.00 |
| **1200.** | **GOVERNMENT RECORDING AND TRANSFER CHARGES** | | |
| 1201. | Recording fees: Deed $ 38.50 ; Mortgage $ 66.50 ; Release $ | 105.00 | |
| 1202. | City/county tax/stamps: Deed $ ; Mortgage $ | 2,205.00 | 147.00 |
| 1203. | State tax/stamps: Deed $ ; Mortgage $ | | 294.00 |
| 1204. | | | |
| 1205. | STATE OF ILLINOIS REGISTRATION FEE | 3.00 | 3.00 |
| **1300.** | **ADDITIONAL SETTLEMENT CHARGES** | | |
| 1301. | Survey to PREFERRED SURVEY | | 300.00 |
| 1302. | Pest inspection to | | |
| 1303. | FINAL WATER BILL TO CITY OF CHICAGO DEPT OF WATER | | 25.31 |
| 1304. | | | |
| 1305. | | | |
| 1306. | | | |
| 1307. | | | |
| **1400.** | **TOTAL SETTLEMENT CHARGES** (enter on lines 103, Section J and 502, Section K) | 9,127.82 | 15,459.31 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Borrower _IDA WHITLEY_          Seller _MARGARET WILK_

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause funds to be disbursed in accordance with this statement.

Settlement Agent _____          Date _5-30-06_

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

OMB No. 2502-0265

```
ORD#/ABS#    587151     JLF                                    TIME OF PRINTING: 11:51
ESC#     000587151      JLF  OC      SUPPLEMENTAL PAGE         DATE OF PRINTING: 05/30/06
```

D. NAME OF BORROWER: IDA WHITLEY
   ADDRESS:          4927 W LEXINGTON
                     CHICAGO                    ILLINOIS              60644

   NAME OF BORROWER:

E. NAME OF SELLER:    MARGARET WILK
   ADDRESS:          8519 S. KENTON
                     CHCIAGO                    ILLINOIS              60644

F. NAME OF LENDER:    TAYLOR BEAN & WHITAKER MORTGAGE CORP
   ADDRESS:          1417 N. MAGNOLIA AVENUE
                     OCALA .                    FLORIDA               34475-9078

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction, I further certify that I have received a copy of the HUD-1 Settlement Statement.

_____          _____
IDA WHITLEY                            MARGARET WILK

HUD-1 (3/86) RESPA, HB 4305.2

# EXHIBIT E

Name:

Address:
**Taylor, Bean & Whitaker Mortgage Corp.**
**1417 North Magnolia Ave**
**Ocala, FL 34475**

After Recording Return To:
**TICOR TITLE**
**6250 W. 95 STREET**
**OAK LAWN** , IL
**60803**

——————— [Space Above This Line For Recording Data] ———————

# MORTGAGE
## (Secondary Lien)

MIN: 100029500011712241

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 10, 12, 17, 19, and 20. Certain rules regarding the usage of words used in this document are also provided in Section 15.

(A) **"Security Instrument"** means this document, which is dated **May 30, 2006** , together with all Riders to this document.

(B) **"Borrower"** is **IDA WHITLEY**

Borrower is the mortgagor under this Security Instrument.

(C) **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(D) **"Lender"** is **Taylor, Bean & Whitaker Mortgage Corp.**
Lender is a **a Florida Corporation** organized and existing under
the laws of **FL** . Lender's address is
**1417 North Magnolia Ave, Ocala, FL  34475**

(E) **"Note"** means the promissory note signed by Borrower and dated **May 30, 2006** . The Note states that Borrower owes Lender **Fifty Eight Thousand Eight Hundred and no/100**
Dollars (U.S. $**58,800.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **June 01, 2036**

(F) **"Property"** means the property that is described below under the heading "Transfer of Rights in the Property."

ILLINOIS MORTGAGE—Single Family—Secondary Lien
THE COMPLIANCE SOURCE, INC. ©
ITEM T8679L1 (0304)—MERS            *(Page 1 of 10 pages)*

GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax: 616-791-1131



*0245021171224*

(G) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, if allowed under Applicable Law, and all sums due under this Security Instrument, plus interest.

(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider    ☐ Condominium Rider    ☐ Second Home Rider

☐ Balloon Rider    ☐ Planned Unit Development Rider    ☐ Biweekly Payment Rider

☐ Home Improvement Rider    ☐ Revocable Trust Rider

☐ Other(s) [specify]

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) **"Escrow Items"** means those items that are described in Section 3.

(M) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. § 2601 *et seq.*) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

**TRANSFER OF RIGHTS IN THE PROPERTY**

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, warrant, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the
**County**                                    of                              **Cook**                                    :
[Type of Recording Jurisdiction]                                        [Name of Recording Jurisdiction]

**See Attached Exhibit A.**

which currently has the address of                           **8519 S KENTON**
[Street]

**CHICAGO**                    , Illinois              **60652**              ("Property Address"):
[City]                                          [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1.     **Payment of Principal, Interest and Other Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and if allowable under Applicable Law, any prepayment charges and late charges due under the Note. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.
2.     **Application of Payments or Proceeds.** Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 14 or in such manner or location as required under Applicable Law. Except as otherwise described in this Section 2, and as permitted under Applicable Law, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall

**ILLINOIS MORTGAGE—**Single Family—**Secondary Lien**
THE COMPLIANCE SOURCE, INC. ©
ITEM T8679L3 (0304)—MERS                    *(Page 3 of 10 pages)*                    GREATLAND ■
To Order Call: 1-800-530-9393 □ Fax 616-791-1131

be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. To the extent permitted by Applicable Law, voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.    **Funds for Escrow Items.** Subject to Applicable Law, Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 8. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 8 and pay such amount and Borrower shall then be obligated under Section 8 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 14 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. Borrower shall not be obligated to make such payments of Funds to Lender to the extent that Borrower makes such payments to the holder of a prior mortgage or deed of trust if such holder is an institutional lender. If under Section 21 the Property is sold or the Property is otherwise acquired by Lender, Lender shall apply no later than immediately prior to the sale of the Property or its acquisition by Lender, any Funds held by Lender at the time of application as a credit against the sums secured by this Security Instrument.

4.    **Charges; Liens.** Borrower shall perform all of Borrower's obligations under any mortgage, deed of trust, or other security agreement with a lien which has priority over this Security Instrument. Borrower shall pay when due, all taxes,

assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien other than a lien disclosed to Lender in Borrower's application or in any title report Lender obtained which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan if allowed under Applicable Law.

5.    **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5, shall be added to the unpaid balance of the loan and interest shall accrue at the Note rate, from the time it was added to the unpaid balance until it is paid in full.

Subject to Applicable Law, all insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 21 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering

the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6.    Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**7.    Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**8.    Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which has or may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has or may attain priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 8, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 8.

Any amounts disbursed by Lender under this Section 8 shall become additional debt of Borrower secured by this Security Instrument if allowed under Applicable Law. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**9.    Mortgage Insurance.** Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect.

**10.    Assignment of Miscellaneous Proceeds; Forfeiture.** The Miscellaneous Proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Security Instrument.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be

applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 17, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 19) and benefit the successors and assigns of Lender.

**13. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, as allowed under Applicable Law. The absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment.

**14. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to

Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**15.   Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**16.   Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**17.   Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 17, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 14 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18.   Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to Section 22 of this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, as allowed under Applicable Law; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged unless as otherwise provided under Applicable Law. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 17.

**19.   Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, if required under Applicable Law, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 14) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed

to be reasonable for purposes of this section. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 21 and the notice of acceleration given to Borrower pursuant to Section 17 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 19.

**20.    Hazardous Substances.** As used in this Section 20: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**21.    Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 17 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

**22.    Release.** Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**23.    Waiver of Homestead.** In accordance with Illinois law, Borrower hereby releases and waives all rights under and by virtue of the Illinois homestead exemption laws.

**24.    Placement of Collateral Protection Insurance.** Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in Borrower's Property. This insurance may, but need not, protect Borrower's interests. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the Property. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by Borrower's and Lender's agreement. If Lender purchases insurance for the Property, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Borrower's total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

## REQUEST FOR NOTICE OF DEFAULT
## AND FORECLOSURE UNDER SUPERIOR
## MORTGAGES OR DEEDS OF TRUST

Borrower and Lender request the holder of any mortgage, deed of trust or other encumbrance with a lien which has priority over this Security Instrument to give notice to Lender, at Lender's address set forth on page one of this Security Instrument, of any default under the superior encumbrance and of any sale or other foreclosure action.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in pages 1 through 10 of this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)    _____ (Seal)
**IDA WHITLEY**                  -Borrower                                -Borrower

_____ (Seal)    _____ (Seal)
                                 -Borrower                                -Borrower

_____ (Seal)    _____ (Seal)
                                 -Borrower                                -Borrower

Witness:                                  Witness:

_____            _____


State of Illinois
County of

   This instrument was acknowledged before me on                              (date) by


                                          (name[s] of person[s]).


                                          _____
                                          Notary Public

# EXHIBIT F

# TRUTH-IN-LENDING DISCLOSURE FOR REAL ESTATE MORTGAGE LOANS

| NAME(S)/ADDRESS(ES) OF BORROWER(S) ("Borrower, you or your") | NAME/ADDRESS OF LENDER (CREDITOR) ("Lender, us or our") |
|---|---|
| IDA WHITLEY<br>4827 W LEXINGTON<br>CHICAGO, IL 60644 | Taylor, Bean & Whitaker Mortgage Corp.<br>1417 North Magnolia Ave<br>Ocala, FL 34475 |

PROPERTY ADDRESS **8519 S KENTON, CHICAGO, IL 60652 Cook**

| LOAN TYPE<br>1171224 | DATE<br>05/30/2006 | ☐ Preliminary | ☒ Final |
|---|---|---|---|

Words, numbers or phrases preceded by a ☐ are applicable only if the ☐ is marked. "e" means estimate.

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | AMOUNT FINANCED<br>The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS<br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 8.9625 % | $ 108,844.23 | $ 57,683.81 | $ 166,528.04 |

|  |  |  |
|---|---|---|
| 359 | 482.58 | 7/1/2006 |

**YOUR PAYMENT SCHEDULE WILL BE:**

## VARIABLE RATE ☐ Applicable  ☒ Not Applicable

The annual percentage rate may increase during the term of this transaction if the

increases. Please refer to the Adjustable Rate Mortgage Documents for specific information concerning the variable rate provisions of this transaction. The rate may not increase more often than and may not increase more than % per adjustment. Any increase will take the form of . For example,

☐ This transaction is subject to a variable rate feature and is secured by your principal dwelling. Variable rate disclosures have been provided at an earlier time.

**PAYABLE ON DEMAND:** ☐ This obligation is payable on demand. ☐ The disclosures are based on an assumed maturity of one year.

Filing / Recording Fee **$105.00**

You may obtain property insurance from anyone acceptable to the lender.

## SECURITY

☐ Goods being purchased.  ☐ Funds on deposit with the lender.
☒ Other (Specify) **8519 S KENTON, CHICAGO, IL 60652 Cook**  ☐ Collateral securing other loans with us may also secure this loan.

## LATE CHARGE

If you are more than **Fifteen** days late in making any payment, in addition to your payment, you will pay a late charge of:
☐ the lesser of ☐ the greater of ☒ an amount equal to ☐ $ or ☒ 5.00 % of the payment in default.

## PREPAYMENT

If you pay off early, you ☐ may ☒ will not have to pay a penalty.
☐ may ☒ will not be entitled to a refund of part of the finance charge.

## ASSUMPTION

If this loan is to purchase and is secured by your principal dwelling, and if checked here, ☒ someone buying your dwelling cannot assume the remainder of this purchase money mortgage loan on the original terms.
If this loan is to purchase and is secured by your principal dwelling, and if checked here, ☐ someone buying your dwelling may, subject to conditions, be allowed to assume the remainder of this purchase money mortgage loan.

☐ Please refer to the "Good Faith Estimate" for a breakdown of fees, charges and amount financed.   ☒ Please refer to the Itemization of Amount Financed Statement.

## SIGNATURES

By signing you acknowledge receipt of a completed copy of this disclosure. You understand that this is not a contract and does not reflect all of the terms and conditions of the mortgage transaction to which the disclosures reflected on this form relate.

X _____   X _____
IDA WHITLEY                  DATE             DATE

X _____   X _____
                             DATE             DATE

© GREATLAND 1995 ITEM T9199L0 (0604)

GREATLAND ■ To Order Call: 1-800-530-9393 □ Fax: 616-791-1131



*0850081171224*

__X__ FEDERAL TRUTH-IN-LENDING DISCLOSURE STATEMENT - PART II "ITEMIZATION OF AMOUNT FINANCED"

____ GOOD FAITH ESTIMATE OF SETTLEMENT CHARGES

        Listed below is the Good Faith Estimate of Settlement Charges made pursuant to the requirements of the Real Estate Settlement Procedures Act (RESPA). These figures are only estimates and the actual charges due at settlement may be different. This is not a commitment to make a loan.

**Taylor, Bean & Whitaker Mortgage Corp.**
1417 North Magnolia Ave
CREDITOR: Ocala, FL  34475

RE:
**IDA WHITLEY**
**4927 W LEXINGTON**
**CHICAGO, IL 60644**

DATE:   **05/30/2006**   LOAN NUMBER:   **1171224**

### ITEMIZATION OF AMOUNT FINANCED

AMOUNTS PAID TO OTHERS ON YOUR BEHALF:

| | |
|---|---|
| Loan proceeds to: | |
| Recording/Filing Fees | 105.00 |
| Credit Report Fees to:   Advance Lending Group C | |
| Appraisal Fees to:   Advance Lending Group C | |
| Title Insurance: | |
| **Recording Fees** | 105.00 |

| | | |
|---|---|---|
| AMOUNT FINANCED | $ | 57,683.80 |
| PREPAID FINANCE CHARGE | $ | 1,116.20 |

Itemization of Prepaid Finance Charge:

| | |
|---|---|
| Loan Origination Fee | 500.00 |
| Discount Points | |
| Prepaid Interest (   2   days) | 28.20 |
| Initial PMI Premium | |
| **Administration Fee** | 515.00 |
| **Tax Service Fee** | 73.00 |

LOAN AMOUNT:  $    **58,800.00**

This form does not cover all items you will be required to pay in cash at settlement; deposits in escrow for real estate taxes and insurance may be different. You may wish to inquire as to the amounts of such other items. You may be required to pay other additional amounts at settlement.

| | | |
|---|---|---|
| **TOTAL PREPAID FINANCE CHARGE** | $ | 1,116.20 |

Neither you nor the lender previously has become obligated to make or accept this loan, nor is any such obligation made by the delivery or signing of this disclosure. The Undersigned acknowledge receiving and reading a completed copy of this disclosure.

| | | | |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| Applicant | Date | Applicant | Date |

| | | | |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| Applicant | Date | Applicant | Date |

C0335L0

# EXHIBIT G

A.



**TICOR TITLE INSURANCE COMPANY**

CLOSER:　Janet L. Fettig

DATE OF PRINTING: 05/30/06
TIME OF PRINTING: 09:42

| B. TYPE OF LOAN | | |
|---|---|---|
| 1. ☐ FHA | 2. ☐ FmHA | 3. ☐ CONV. UNINS. |
| 4. ☐ VA | 5. ☐ CONV. INS. | |
| 6. File Number:　587151A | | |
| 587151A-001　　JLF　OC | | |
| 7. Loan Number　1171224 | | |
| 8. Mortgage Insurance Case Number | | |

**SETTLEMENT STATEMENT**
**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**

C. NOTE: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. NAME OF BORROWER: | IDA WHITTLEY | | |
|---|---|---|---|
| ADDRESS: | 8519 S. KENTON | | |
| | CHCIAGO | ILLINOIS | 60652 |

| E. NAME OF SELLER: | |
|---|---|
| ADDRESS: | |

| F. NAME OF LENDER: | TAYLOR, BEAN & WHITAKER MORTGAGE CORP | | |
|---|---|---|---|
| ADDRESS: | 1417 N MAGNOLIA AVE | | |
| | OCALA | FLORIDA | 34475 |

| G. PROPERTY LOCATION: | 8519 S. KENTON | | |
|---|---|---|---|
| | CHICAGO | ILLINOIS | 60652 |

| H. SETTLEMENT AGENT: | TICOR TITLE INSURANCE COMPANY | | I. SETTLEMENT DATE: |
|---|---|---|---|
| ADDRESS: | 6250 WEST 95TH STREET | | May 30, 2006 |
| | OAK LAWN | ILLINOIS　60453 | |
| PLACE OF SETTLEMENT: | 6250 WEST 95th STREET | | DISBURSEMENT DATE: |
| ADDRESS: | OAK LAWN | ILLINOIS　60453 | May 30, 2006 |

| J. SUMMARY OF BORROWER'S TRANSACTION | | K. SUMMARY OF SELLER'S TRANSACTION | |
|---|---|---|---|
| **100. GROSS AMOUNT DUE FROM BORROWER** | | **400. GROSS AMOUNT DUE TO SELLER:** | |
| 101. Contract sales price | | 401. Contract sales price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement charges to borrower  (line 1400) | 1,580.70 | 403. | |
| 104. PROCEEDS TO 1ST MORTGAGE | 57,219.30 | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City/town taxes　　to | | 406. City/town taxes　　　to | |
| 107. County taxes　　to | | 407. County taxes　　　　to | |
| 108. Assessments　　to | | 408. Assessments　　　　to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. GROSS AMT DUE FROM BORROWER** | 58,800.00 | **420. GROSS AMT DUE TO SELLER** | |
| **200. AMOUNTS PAID BY OR IN BEHALF OF BORROWER** | | **500. REDUCTIONS IN AMOUNT DUE TO SELLER:** | |
| 201. Deposit or earnest money | | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 58,800.00 | 502. Settlement charges to seller　　(line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| | | 504. Payoff of first mortgage loan | |
| 204. | | | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City/town taxes　　to | | 510. City/town taxes　　　to | |
| 211. County taxes　　to | | 511. County taxes　　　　to | |
| 212. Assessments　　to | | 512. Assessments　　　　to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. TOTAL PAID BY/FOR BORROWER** | 58,800.00 | **520. TOTAL REDUCTIONS AMT DUE SELLER** | |
| **300. CASH AT SETTLEMENT FROM/TO BORROWER** | | **600. CASH AT SETTLEMENT TO/FROM SELLER** | |
| 301. Gross amt due from borrower　(line 120) | 58,800.00 | 601. Gross amt due to seller　　(line 420) | |
| 302. Less amts paid by/for borrower (line 220) | ( 58,800.00) | 602. Less reductions in amt due seller (line 520) | ( 0.00) |
| 303. CASH(☐ FROM) (☒ TO) BORROWER | 0.00 | 603. CASH(☐ TO) (☒ FROM) SELLER | 0.00 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Borrower　_Ida Whitley_　　　　Seller　_____
　　　　　IDA WHITLEY

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

Settlement Agent　_Jan L Fetti_　　　　Date　5-30-06

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

HUD-1 (3/86) RESPA, HB 4305.2

F-2857-01 4/80

| ORD#/ABS#  587151A | | |
|---|---|---|
| ESC#  587151A  JLF  OC | | |

**L. SETTLEMENT CHARGES**

TIME OF PRINTING: 09:42
DATE OF PRINTING: 05/30/06

| | | PAID FROM BORROWER'S FUNDS AT SETTLEMENT | PAID FROM SELLER'S FUNDS AT SETTLEMENT |
|---|---|---|---|
| **700.** | **TOTAL SALES/BROKER'S COMMISSION based on price** $ @ %= | | |
| | Division of Commission (line 700) as follows: | | |
| 701. | LB: $ to | | |
| 702. | SB: $ to | | |
| 703. | Commission paid at Settlement (Money retained by broker applied to commission $ ) | | |
| 704. | Other sales agent charges: | | |
| 705. | Additional commission: $ to | | |
| **800.** | **ITEMS PAYABLE IN CONNECTION WITH LOAN** | | |
| 801. | Loan Origination Fee  0.850  %  ADVANCE LENDING GROUP CORP | 500.00 | |
| 802. | Loan Discount % | | |
| 803. | Appraisal Fee to | | |
| 804. | Credit Report to | | |
| 805. | Lender's Inspection Fee to | | |
| 806. | Mortgage Insurance Application Fee to | | |
| 807. | Assumption Fee to | | |
| 808. | PAR PREMIUM TO ADVANCE LENDING GROUP $1176.00 POC BY TBW | | |
| 809. | TAX SERVICE FEE TO TAYLOR, BEAN & WHITAKER MORTGAGE CORP | 73.00 | |
| 810. | ADMINISTRATION FEE TO TAYLOR, BEAN & WHITAKER MORTGAGE CORP | 515.00 | |
| 811. | | | |
| 812. | | | |
| **900.** | **ITEMS REQUIRED BY LENDER TO BE PAID IN ADVANCE** | | |
| 901. | Interest from  05/30/06  to  06/01/06  @$  14.1000 /day for  2  days | 28.20 | |
| 902. | Mortgage Insurance Premium for  0.00  months to | | |
| 903. | Hazard Insurance Premium for  0.00  years to | | |
| 904. | | | |
| 905. | | | |
| **1000.** | **RESERVES DEPOSITED WITH LENDER** | | |
| 1001. | Hazard insurance  0.00  month @$  per month | | |
| 1002. | Mortgage insurance  0.00  month @$  per month | | |
| 1003. | City property taxes  0.00  month @$  per month | | |
| 1004. | County property taxes  0.00  month @$  per month | | |
| 1005. | Annual assessments  0.00  month @$  per month | | |
| 1006. | 0.00 month @$  per month | | |
| 1007. | 0.00 month @$  per month | | |
| 1008. | Aggregate Accounting Adjustment | 0.00 | 0.00 |
| **1100.** | **TITLE CHARGES** | | |
| 1101. | Settlement or Closing Fee  to TICOR TITLE INSURANCE COMPANY | 150.00 | |
| 1102. | Abstract or title search  to | | |
| 1103. | Title examination  to | | |
| 1104. | Title insurance binder  to | | |
| 1105. | Document preparation  to | | |
| 1106. | Notary fees  to | | |
| 1107. | Attorney's fee  to | | |
| 1108. | Title insurance  to TICOR TITLE - | 220.00 | |
| | (includes above items numbers:) | | |
| 1109. | Lender's coverage  $ 58,800.00  $  220.00 | | |
| 1110. | Owner's coverage  $ 0.00  $ | | |
| 1111. | EMAIL PACKAGE FEE TO TICOR TITLE INSURANCE COMPANY | 25.00 | |
| 1112. | | | |
| 1113. | | | |
| **1200.** | **GOVERNMENT RECORDING AND TRANSFER CHARGES** | | |
| 1201. | Recording fees: Deed $  ; Mortgage $  66.50 : Release $ | 66.50 | |
| 1202. | City/county tax/stamps:  Deed $  : Mortgage $ | | |
| 1203. | State tax/stamps:  Deed $  : Mortgage $ | | |
| 1204. | | | |
| 1205. | STATE OF ILLINOIS REGISTRATION FEE | 3.00 | |
| **1300.** | **ADDITIONAL SETTLEMENT CHARGES** | | |
| 1301. | Survey  to | | |
| 1302. | Pest inspection  to | | |
| 1303. | | | |
| 1304. | | | |
| 1305. | | | |
| 1306. | | | |
| 1307. | | | |
| **1400.** | **TOTAL SETTLEMENT CHARGES**  (enter on lines 103, Section J and 502, Section K) | 1,580.70 | |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Borrower _IDA WHITLEY_     Seller _____

IDA WHITLEY

The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused or will cause funds to be disbursed in accordance with this statement.

Settlement Agent _____     Date 5-30-06

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine and imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010.

HUD-1 (3/86) RESPA, HB 4305.2

OMB No. 2502-0265

| ORD#/ABS# | 587151A | | | SUPPLEMENTAL PAGE | TIME OF PRINTING: 09:42 |
| ESC# | 587151A | JLF | OC | | DATE OF PRINTING: 05/30/06 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction, I further certify that I have received a copy of the HUD-1 Settlement Statement.

_Ida Whitley_
IDA WHITLEY

JLF

HUD-1 (3/86) RESPA, HB 4305.2

# EXHIBIT H

# Uniform Residential Loan Application

This application is designed to be completed by the applicant(s) with the Lender's assistance. Applicants should complete this form as "Borrower" or "Co-Borrower," as applicable. Co-Borrower information must also be provided (and the appropriate box checked) when ☐ the income or assets of a person other than the Borrower (including the Borrower's spouse) will be used as a basis for loan qualification or ☐ the income or assets of the Borrower's spouse or other person who has community property rights pursuant to state law will not be used as a basis for loan qualification, but his or her liabilities must be considered because the spouse or other person has community property rights pursuant to applicable law and Borrower resides in a community property state, the security property is located in a community property state, or the Borrower is relying on other property located in a community property state as a basis for repayment of the loan.

If this is an application for joint credit, Borrower and Co-Borrower each agree that we intend to apply for joint credit (sign below):

Borrower **IDA WHITLEY**          Co-Borrower

## I. TYPE OF MORTGAGE AND TERMS OF LOAN

| Mortgage Applied for: | ☐ VA ☐ FHA | ☐ Conventional ☐ USDA/Rural Housing Service | ☐ Other (explain): | Agency Case Number | Lender Case Number **1171224** |
|---|---|---|---|---|---|
| Amount **$58,800.00** | Interest Rate **8.7500%** | No. of Months **360** | Amortization Type: | ☒ Fixed Rate ☐ GPM | ☐ Other (explain): ☐ ARM (type): |

## II. PROPERTY INFORMATION AND PURPOSE OF LOAN

| Subject Property Address (street, city, state & ZIP) **8519 S KENTON, CHICAGO, IL 60652** | | No. of Units **1** |
|---|---|---|
| Legal Description of Subject Property (attach description if necessary) **See Attached Exhibit A.** | | Year Built **1958** |

| Purpose of Loan | ☒ Purchase ☐ Refinance | ☐ Construction ☐ Construction-Permanent | ☐ Other (explain): | Property will be: ☒ Primary Residence ☐ Secondary Residence ☐ Investment |
|---|---|---|---|---|

*Complete this line if construction or construction-permanent loan.*

| Year Lot Acquired | Original Cost $ | Amount Existing Liens $ | (a) Present Value of Lot $ | (b) Cost of Improvements $ | Total (a + b) **$0.00** |
|---|---|---|---|---|---|

*Complete this line if this is a refinance loan.*

| Year Acquired | Original Cost $ | Amount Existing Liens $ | Purpose of Refinance | Describe Improvements ☐ made ☐ to be made | |
|---|---|---|---|---|---|
| | | | | Cost: $ | |

| Title will be held in what Name(s) **IDA WHITLEY** **IDA WHITLEY** | Manner in which Title will be held **IDA WHITLEY** | Estate will be held in: ☒ Fee Simple ☐ Leasehold (show expiration date) |
|---|---|---|

Source of Down Payment, Settlement Charges, and/or Subordinate Financing (explain)

## III. BORROWER INFORMATION

| | Borrower | Co-Borrower |
|---|---|---|
| Borrower's Name (include Jr. or Sr. if applicable) **IDA WHITLEY** | | Co-Borrower's Name (include Jr. or Sr. if applicable) |

| Social Security Number **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** | Home Phone (incl. area code) **(773) 287-8213** | DOB (mm/dd/yyyy) **01/18/1950** | Yrs. School **16.0** | Social Security Number | Home Phone (incl. area code) | DOB (mm/dd/yyyy) | Yrs. School |
|---|---|---|---|---|---|---|---|
| ☒ Married ☐ Unmarried (include single, divorced, widowed) ☐ Separated | | Dependents (not listed by Co-Borrower) no. ages | | ☐ Married ☐ Unmarried (include single, divorced, widowed) ☐ Separated | | Dependents (not listed by Borrower) no. ages | |
| Present Address (street, city, state, ZIP) ☐ Own ☒ Rent **10.0** No. Yrs. **4927 W LEXINGTON CHICAGO, IL 60644** | | | | Present Address (street, city, state, ZIP) ☐ Own ☐ Rent No. Yrs. | | | |
| Mailing Address, if different from Present Address | | | | Mailing Address, if different from Present Address | | | |

*If residing at present address for less than two years, complete the following:*

| Former Address (street, city, state, ZIP) ☐ Own ☐ Rent No. Yrs. | | Former Address (street, city, state, ZIP) ☐ Own ☐ Rent No. Yrs. | |
|---|---|---|---|

## IV. EMPLOYMENT INFORMATION

| | Borrower | | Co-Borrower | |
|---|---|---|---|---|
| Name & Address of Employer ☐ Self Employed **CITY OF CHICAGO 1685 N THROOP CHICAGO, IL 60644** | Yrs. on this job **10.0** Yrs. employed in this line of work/profession **10.0** | Name & Address of Employer ☐ Self Employed | Yrs. on this job Yrs. employed in this line of work/profession | |
| Position/Title/Type of Business **MECHANIC** | Business Phone (incl. area code) **(312) 744-3900** | Position/Title/Type of Business | Business Phone (incl. area code) | |

Freddie Mac Form 65 7/05

ITEM 7300L1 (0508)          *(Page 1 of 5 pages)*

Fannie Mae Form 1003 7/05

GreatDocs™ • To Order Call: 1-800-968-5775

If employed in current position for less than two years or if currently employed in more than one position, complete the following:

## IV. EMPLOYMENT INFORMATION (cont'd)

| Borrower | | | Co-Borrower | | |
|---|---|---|---|---|---|
| Name & Address of Employer | ☐ Self Employed | Dates (from - to) | Name & Address of Employer | ☐ Self Employed | Dates (from - to) |
| | | Monthly Income $ | | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | | Position/Title/Type of Business | Business Phone (incl. area code) | |
| Name & Address of Employer | ☐ Self Employed | Dates (from - to) | Name & Address of Employer | ☐ Self Employed | Dates (from - to) |
| | | Monthly Income $ | | | Monthly Income $ |
| Position/Title/Type of Business | Business Phone (incl. area code) | | Position/Title/Type of Business | Business Phone (incl. area code) | |

## V. MONTHLY INCOME AND COMBINED HOUSING EXPENSE INFORMATION

| Gross Monthly Income | Borrower | Co-Borrower | Total | Combined Monthly Housing Expense | Present | Proposed |
|---|---|---|---|---|---|---|
| Base Empl. Income* | $ 6,800.00 | $ | $ 6,800.00 | Rent | $ 1,100.00 | |
| Overtime | | | 0.00 | First Mortgage (P&I) | | $ 462.58 |
| Bonuses | | | 0.00 | Other Financing (P&I) | | 462.58 |
| Commissions | | | 0.00 | Hazard Insurance | | 82.00 |
| Dividends/Interest | | | 0.00 | Real Estate Taxes | | 187.25 |
| Net Rental Income | | | 0.00 | Mortgage Insurance | | |
| Other (before completing, see the notice in describe other income," below) | | | 0.00 | Homeowner Assn. Dues | | |
| | | | 0.00 | Other: | | |
| Total | $ 6,800.00 | $ | $ 6,800.00 | Total | $ 1,100.00 | $ 1,194.41 |

* Self Employed Borrower(s) may be required to provide additional documentation such as tax returns and financial statements.

| Describe Other Income | Notice: Alimony, child support, or separate maintenance income need not be revealed if the Borrower (B) or Co-Borrower (C) does not choose to have it considered for repaying this loan. | |
|---|---|---|
| B/C | | Monthly Amount |
| | | $ |

## VI. ASSETS AND LIABILITIES

This Statement and any applicable supporting schedules may be completed jointly by both married and unmarried Co-Borrowers if their assets and liabilities are sufficiently joined so that the Statement can be meaningfully and fairly presented on a combined basis; otherwise, separate Statements and Schedules are required. If the Co-Borrower section was completed about a non-applicant spouse or other person, this Statement and supporting schedules must be completed about that spouse or other person also.

Completed ☐ Jointly ☐ Not Jointly

| ASSETS Description | Cash or Market Value | Liabilities and Pledged Assets. List the creditor's name, address, and account number for all outstanding debts, including automobile loans, revolving charge accounts, real estate loans, alimony, child support, stock pledges, etc. Use continuation sheet, if necessary. Indicate by (*) those liabilities, which will be satisfied upon sale of real estate owned or upon refinancing of the subject property. | | |
|---|---|---|---|---|
| Cash deposit toward purchase held by: | $ | | | |
| *List checking and savings accounts below* | | LIABILITIES | Monthly Payment & Months Left to Pay | Unpaid Balance |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company simultaneous | $ Payment/Months 1,644.55 144 | $ 235,200.00 |
| Acct. no. | $ | Acct. no. 1136397 | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company GMAC | $ Payment/Months 647.00 38 | $ 24,501.00 |
| Acct. no. | $ | Acct. no. | | |
| Name and address of Bank, S&L, or Credit Union | | Name and address of Company UNITED CREDIT UNION | $ Payment/Months 182.00 5 | $ 872.00 |
| Acct. no. | $ | Acct. no. | | |

Freddie Mac Form 65 7/05

ITEM 7300L2 (0508)

*(Page 2 of 5 pages)*

Fannie Mae Form 1003 7/05

GreatDocs™ • To Order Call: 1-800-968-5775

## VI. ASSETS AND LIABILITIES

| Name and address of Bank, S&L, or Credit Union | | Name and address of Company | $ Payment/Months | |
|---|---|---|---|---|
| | | **JB ROBINSON** | 35.00 | 35.00 |
| | | | 1 | |
| Acct. no. | $ | | | |
| Stocks & Bonds (Company name/ number & description) | $ | Acct. no. | | |
| | | Name and address of Company | $ Payment/Months | |
| | | | | $ |
| Life insurance net cash value | $ | | | |
| Face amount: $ | | Acct. no. | | |
| Subtotal Liquid Assets | $ | Name and address of Company | $ Payment/Months | |
| Real estate owned (enter market value from schedule of real estate owned) | $ | | | |
| Vested interest in retirement fund | $ | | | |
| Net worth of business(es) owned (attach financial statement) | $ | Acct. no. | | |
| | | Name and address of Company | $ Payment/Months | |
| Automobiles owned (make and year) | $ | | | $ |
| | | Acct. no. | | |
| | | Alimony/Child Support/Separate Maintenance Payments Owed to: | $ | |
| Other Assets (itemize) | $ | Job-Related Expense (child care, union dues, etc.) | $ | |
| | | Total Monthly Payments | $ 2,508.55 | |
| Total Assets a. | $ | Net Worth (a minus b) ► $ (260,608.00) | Total Liabilities b. | $ 260,608.00 |

**Schedule of Real Estate Owned** (If additional properties are owned, use continuation sheet.)

| Property Address (enter S if sold, PS if pending sale or R if rental being held for income) ▼ | Type of Property | Present Market Value | Amount of Mortgages & Liens | Gross Rental Income | Mortgage Payments | Insurance, Maintenance, Taxes & Misc. | Net Rental Income |
|---|---|---|---|---|---|---|---|
| | | $ | $ | $ | $ | $ | $ |
| | | | | | | | |
| | | | | | | | |
| | Totals | $ | $ | $ | $ | $ | $ |

List any additional names under which credit has previously been received and indicate appropriate creditor name(s) and account number(s):

| Alternate Name | Creditor Name | Account Number |
|---|---|---|
| | | |
| | | |

## VII. DETAILS OF TRANSACTION

| | | | | VIII. DECLARATIONS | | Borrower | | Co-Borrower | |
|---|---|---|---|---|---|---|---|---|---|

| | | | If you answer "Yes" to any questions a through i, please use continuation sheet for explanation. | | Yes | No | Yes | No |
|---|---|---|---|---|---|---|---|---|
| a. | Purchase price | $ | 294,000.00 | a. Are there any outstanding judgments against you? | | ☐ | ☒ | ☐ | ☐ |
| b. | Alterations, improvements, repairs | | | b. Have you been declared bankrupt within the past 7 years? | | ☐ | ☒ | ☐ | ☐ |
| c. | Land (if acquired separately) | | | c. Have you had property foreclosed upon or given title or deed in lieu thereof in the last 7 years? | | ☐ | ☒ | ☐ | ☐ |
| d. | Refinance (incl. debts to be paid off) | | | | | | | | |
| e. | Estimated prepaid items | | | | | | | | |
| f. | Estimated closing costs | | 3,029.00 | d. Are you a party to a lawsuit? | | ☐ | ☒ | ☐ | ☐ |
| g. | PMI, MIP, Funding Fee | | | e. Have you directly or indirectly been obligated on any loan which resulted in foreclosure, transfer of title in lieu of foreclosure, or judgment? | | ☐ | ☒ | ☐ | ☐ |
| h. | Discount (if Borrower will pay) | | | | | | | | |
| i. | Total costs (add items a through h) | | 297,029.00 | (This would include such loans as home mortgage loans, SBA loans, home improvement loans, educational loans, manufactured (mobile) home loans, any mortgage, financial obligation, bond, or loan guarantee. If "Yes," provide details, including date, name, and address of Lender, FHA or VA case number, if any, and reasons for the action.) | | | | | |

| VII. DETAILS OF TRANSACTION (cont'd) | | VIII. DECLARATIONS (cont'd) | | | | |
|---|---|---|---|---|---|---|

| VII. DETAILS OF TRANSACTION (cont'd) | | | Borrower | | Co-Borrower | |
|---|---|---|---|---|---|---|
| | | If you answer "Yes" to any questions a through i, please use continuation sheet for explanation. | Yes | No | Yes | No |
| j. Subordinate financing | 235,200.00 | f. Are you presently delinquent or in default on any Federal debt or any other loan, mortgage, financial obligation, bond, or loan guarantee? If "Yes," give details as described in the preceding question. | | X | | |
| k. Borrower's closing costs paid by Seller | | g. Are you obligated to pay alimony, child support, or separate maintenance? | | X | | |
| l. Other Credits (explain) | 2,176.00 | h. Is any part of the down payment borrowed? | | X | | |
| | | i. Are you a co-maker or endorser on a note? | | X | | |
| m. Loan amount (exclude PMI, MIP, Funding Fee financed) | 58,800.00 | j. Are you a U.S. citizen? | X | | | |
| | | k. Are you a permanent resident alien? | | X | | |
| n. PMI, MIP, Funding Fee financed | | l. Do you intend to occupy the property as your primary residence? If "Yes," complete question m below. | X | | | |
| o. Loan amount (add m & n) | 58,800.00 | m. Have you had an ownership interest in a property in the last three years? | | X | | |
| | | (1) What type of property did you own—principal residence (PR), second home (SH), or investment property (IP)? | | | | |
| p. Cash from/to Borrower (subtract j, k, l & o from i) | | (2) How did you hold title to the home—solely by yourself (S), jointly with your spouse (SP), or jointly with another person (O)? | | | | |

## IX. ACKNOWLEDGEMENT AND AGREEMENT

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; (2) the loan requested pursuant to this application (the "Loan") will be secured by a mortgage or deed of trust on the property described in this application; (3) the property will not be used for any illegal or prohibited purpose or use; (4) all statements made in this application are made for the purpose of obtaining a residential mortgage loan; (5) the property will be occupied as indicated in this application; (6) the Lender, its servicers, successors or assigns may retain the original and/or an electronic record of this application, whether or not the Loan is approved; (7) the Lender and its agents, brokers, insurers, servicers, successors, and assigns may continuously rely on the information contained in the application, and I am obligated to amend and/or supplement the information provided in this application if any of the material facts that I have represented herein should change prior to closing of the Loan; (8) in the event that my payments on the Loan become delinquent, the Lender, its servicers, successors or assigns may, in addition to any other rights and remedies that it may have relating to such delinquency, report my name and account information to one or more consumer reporting agencies; (9) ownership of the Loan and/or administration of the Loan account may be transferred with such notice as may be required by law; (10) neither Lender nor its agents, brokers, insurers, servicers, successors or assigns has made any representation or warranty, express or implied, to me regarding the property or the condition or value of the property; and (11) my transmission of this application as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or my facsimile transmission of this application containing a facsimile of my signature, shall be as effective, enforceable and valid as if a paper version of this application were delivered containing my original written signature.

**Acknowledgement.** Each of the undersigned hereby acknowledges that any owner of the Loan, its servicers, successors and assigns, may verify or reverify any information contained in this application or obtain any information or data relating to the Loan, for any legitimate business purpose through any source, including a source named in this application or a consumer reporting agency.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X IDA WHITLEY | | X | |

## X. INFORMATION FOR GOVERNMENT MONITORING PURPOSES

The following information is requested by the Federal Government for certain types of loans related to a dwelling in order to monitor the lender's compliance with equal credit opportunity, fair housing and home mortgage disclosure laws. You are not required to furnish this information, but are encouraged to do so. The law provides that a lender may not discriminate either on the basis of this information, or on whether you choose to furnish it. If you furnish the information, please provide both ethnicity and race. For race, you may check more than one designation. If you do not furnish ethnicity, race, or sex, under Federal regulations, this lender is required to note the information on the basis of visual observation and surname if you have made this application in person. If you do not wish to furnish the information, please check the box below. (Lender must review the above material to assure that the disclosures satisfy all requirements to which the lender is subject under applicable state law for the particular type of loan applied for.)

| BORROWER | ☐ I do not wish to furnish this information | | CO-BORROWER | ☐ I do not wish to furnish this information | |
|---|---|---|---|---|---|
| Ethnicity: | ☐ Hispanic or Latino | ☒ Not Hispanic or Latino | Ethnicity: | ☐ Hispanic or Latino | ☐ Not Hispanic or Latino |
| Race: | ☐ American Indian or Alaska Native   ☐ Asian   ☐ Black or African American | | Race: | ☐ American Indian or Alaska Native   ☐ Asian   ☐ Black or African American | |
| | ☐ Native Hawaiian or Other Pacific Islander   ☒ White | | | ☐ Native Hawaiian or Other Pacific Islander   ☐ White | |
| Sex: | ☒ Female   ☐ Male | | Sex: | ☐ Female   ☐ Male | |

| To be Completed by Interviewer | Interviewer's Name (print or type) | Name and Address of Interviewer's Employer |
|---|---|---|
| This application was taken by: | Anita Logan | Advance Lending Group Corp. |
| ☒ Face-to-face interview | | 4457 W. Fullerton Chicago |
| ☐ Mail | Interviewer's Signature          Date | Chicago, IL  60639 |
| ☐ Telephone | | |
| ☐ Internet | Interviewer's Phone Number (incl. area code) | |
| | (352) 369-6200 | |

Case 1:08-cv-00114 Document 14-2 Filed 05/26/2009 Page 13 of 13

CONTINUATION SHEET/RESIDENTIAL LOAN APPLICATION

| Use this continuation sheet if you need more space to complete the Residential Loan Application. Mark B f or Borrower or C for Co-Borrower. | Borrower: **IDA WHITLEY** | Agency Case Number: |
|---|---|---|
| | Co-Borrower: | Lender Case Number: **1171224** |

I/We fully understand that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under the provisions of Title 18, United States Code, Section 1001, et seq.

| Borrower's Signature | Date | Co-Borrower's Signature | Date |
|---|---|---|---|
| X _____ **IDA WHITLEY** | | X _____ | |

**Freddie Mac Form 65 7/05**

ITEM 7300L5 (0508)

*(Page 5 of 5 pages)*

**Fannie Mae Form 1003 7/05**

GreatDocs™ • To Order Call: 1-800-968-5775